IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Amanda Caton, *et al.*, | : | |
| | : | Case No. 1:22-cv-345 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| Jacob Salamon, *et al.*, | : | Part Defendants' Motion for Summary |
| | : | Judgment |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment.  (Doc. 22.)  This case arose when Defendant Jacob Salamon, a police officer for the City of Loveland, Ohio, arrested Plaintiff Amanda Caton, an off-duty police officer for the City of Cincinnati, Ohio, for operating a vehicle when intoxicated ("OVI").  Plaintiff Patrick Caton, Amanda Caton's husband and also an off-duty police officer for the City of Cincinnati, was a passenger in the vehicle when Amanda Caton was pulled over and arrested, and he was present when Officer Salamon later dropped off Amanda Caton to their home.  The Catons have sued Officer Salamon, former Loveland Police Chief Dennis Rahe, Officer Shawn Parks, and the City of Loveland for violating their rights under the Constitution and Ohio law.  Defendants now move for summary judgment on all claims stated against them.  For the reasons below, the Court will **GRANT IN PART AND DENY IN PART** the Motion for Summary Judgment.

I.      BACKGROUND

A.      **Factual History**

Except where otherwise noted, the facts come from Defendants' Proposed Undisputed Facts and Plaintiffs' Response.  (Doc. 22-1, 30-4.)

1.     **The Parties**

The City of Loveland is an Ohio municipal corporation.  At all relevant times, Salamon and Parks were police officers and Rahe was the police chief with the City of Loveland Police Department.  Amanda and Patrick Caton were police officers with the City of Cincinnati Police Department.  (Doc. 12 at PageID 94–95; Doc. 13 at PageID 296.)

At the time Officer Salamon was hired by the Loveland Police Department in 2016, he was the subject of a misconduct investigation by his former employer, the Ohio State Highway Patrol, for dishonesty and failure to report damage to his vehicle.  (Doc. 17 at PageID 906–913, 928–931.)  Officer Salamon asserted that Chief Rahe was aware of this fact when he was hired, but Chief Rahe denied that he had knowledge.  (*Id.*; Doc. 16 at PageID 699.)  The Ohio State Highway Patrol investigator recommended that Officer Salamon not be considered for a rehire if the opportunity arose.  (Doc. 17-1 at PageID 1461.)

2.     **Amanda Caton's Arrest**

On Saturday, February 8, 2020, while off-duty, the Catons left their home and went to dinner at a restaurant in Loveland, Ohio.  Amanda Caton carried her clutch purse in which she placed her personal firearm with two extra magazines.  She consumed approximately two and one-half beers at the restaurant over three hours.  After leaving the first restaurant, the Catons walked to a second restaurant/bar.  Caton ordered a beer there, but she is unsure if she drank it.  (Doc. 12 at PageID 148.)  They then went with her brother and sister-in-law to a third establishment, a bar, arriving there between 11:00 p.m. and 11:30 p.m.  They left the bar between 1:30 a.m. and 2:00 a.m.  Amanda Caton, with Patrick Caton as the passenger, began to drive back to their house.

Officer Salamon was on duty the evening of February 8, 2020.  His police cruiser was

equipped with a camera on the car dashboard.  The dashcam was actived manually or when an officer turns on the overhead lights.  The dashcam then recorded and saved the video from thirty seconds before it was activated until it is turned off.  (Doc. 17 at PageID 990–991.)  Salamon wore a shoulder-mounted repeater on his body that would record audio sound to the dashcam.  (*Id.* at PageID 987.)  On the night of the incident, Officer Salamon turned on the dashcam manually when he saw the Caton vehicle turn left from five-point intersection from Second Street to Broadway Street because he believed that the vehicle crossed left of center during the turn resulting in a marked-lane violation under Ohio law.

The Court has reviewed the dashcam recording.[1]  The audio portion begins at the 30-second mark, immediately after the Caton vehicle has turned left onto Broadway Street.  (Dashcam at 00:30.)  Officer Salamon audibly narrated what he saw as driving violations by the Caton vehicle.  The recording shows that Officer Salamon followed the Caton vehicle for at least 2 minutes and 38 seconds before he turned on his overhead lights to initiate the traffic stop.  (Dashcam at 02:38.)

The recording shows the Caton vehicle cutting a sharp angle on the left-hand turn at the five-way intersection from Second Street to Broadway Street such that all four wheels were to the left of the dashed yellow center line marking the left turn lane through the intersection.  (Dashcam at 00:26–00:29.)  When the vehicle entered onto Broadway Street, both left tires crossed the double yellow lines separating opposing lanes of traffic and the perpendicular solid white stop bar in the lane for oncoming traffic.  (Dashcam at 00:29.)

The vehicle then proceeded down Broadway Street for about two minutes.  Broadway Street was a two-lane road with traffic divided by two solid yellow lines.  The vehicle's left tires cross onto the solid yellow center lines four separate time between the 01:14 and 02:30 time

---

[1]  A copy of the dashcam recording was manually filed at CM/ECF Doc. 18.

3

marks, but the vehicle did not cross into the oncoming traffic lane.  (Dashcam at 01:14–01:16, 01:22, 02:09, and 02:30.)  The dashcam does not show the Caton vehicle's rate of speed, but the vehicle does slow down at a sharp curve in the road.  There was no other traffic on the road.

Officer Salamon called in the Caton vehicle license number and turned on his overhead flashing lights.  (Dashcam 02:38–02:50.) The Caton vehicle slowed down and then stopped at the side of the road at the second driveway entrance it passed.  (Dashcam 02:38–03:00.)  Officer Salamon approached Amanda Caton at the driver side window and requested her license and insurance.  (Dashcam at 03:21–03:27.)  Officer Salamon told Amanda Caton that he stopped her for the marked lane violation at the five-way intersection.  (Dashcam at 03:42–03:51.)  Amanda Caton responded "Okay.  I am a Cincinnati police officer too if that makes a difference." (Dashcam at 03:51–03:54.)  Officer Salamon asked Amanda Caton if she had a gun on her, and she responded that it was in her purse.  (Dashcam at 04:04–04:10.)  Amanda Caton gave her purse with the firearm to Officer Salamon so he could secure it in the back of Caton vehicle. (Dashcam at 04:25.)  Officer Salamon asked Amanda Caton four times to pop her trunk or unlock the car so he could open the rear door.  (Dashcam at 04:26–04:50.)  She did not do so until Patrick Caton stated, "Unlock your car, Amanda."  (Dashcam at 04:48–04:50.)

Officer Salamon told Amanda Caton that he smelled alcohol on her and that her speech was slurred.  (Dashcam at 05:14–05:16.)  Amanda Caton was asked about her speech and hearing at her later deposition.  She testified that she had hearing problems and wore hearing aids, including on the night she was pulled over.  (Doc. 12 at PageID 117.)  She also testified that her speech is "different" because she was not born in the United States and she has "a bit" of a British accent.  (*Id.* at PageID 118.)

Officer Salamon also told the Catons that they "reeked of alcohol" and that Patrick Caton

had been "passed out sleeping when I pulled you over." (Dashcam at 06:04–06:08.)  Patrick

Caton vehemently denied he was passed out sleeping and he denied that Amanda Caton was

slurring her words. (Dashcam at 06:08–06:11, 06:17.)  Officer Salamon later testified at his

deposition that he had been mistaken in thinking that Patrick Caton had passed out. (Doc. 17 at

PageID 1024.)

Officer Salamon also noted in his arrest report that Amanda Caton's "eyes were glassy

and blood shot." (Doc. 17-1 at PageID 1557.)  At her deposition, Amanda Caton stated that she

had a medical condition with her eyelids that she described as "hooded eyes," which caused her

eyes to be fatigued and watery. (Doc. 12 at PageID 122, 125.)  She did not know if her eyes

appeared to be bloodshot or red that night. (*Id.* at PageID 125.)

After arguing with the Catons, Officer Salamon asked Amanda Caton to step out of the

car, and she complied. (Dashcam at 07:07–07:17.)  Amanda Caton and Officer Salamon then

stepped away from the Caton vehicle and talked in front of the police cruiser. (Dashcam at

07:17–07:29.)  Amanda Caton did not have any visible difficulty walking to the cruiser. (*Id.*)

Amanda Caton first said she would not consent to any field sobriety tests, and she remarked on

the fact that she was wearing heels, but then she agreed to take the horizontal gaze nystagmus

("HGN") vision test. (Dashcam at 08:10–08:33.)  Officer Parks then arrived at the scene as the

back-up Officer Salamon had requested. (Dashcam at 08:50–08:52.)  Officer Salamon then

started to administer the HGN test as Amanda Caton informed him that she had a "lazy eye."

(Dashcam at 09:50–09:53.)  Officer Salamon checked that Amanda Caton's eyes tracked equally

and then administered the test by moving the pen back and forth right to left four times with the

top of the pen just below her eye level. (Dashcam at 09:53–11:35.)  He then turned the pen

horizontal and moved it up and down two times from her eye level to above her head and back.

5

(Dashcam at 11:35–11:53.)  Amanda Caton is standing sideways to the dashcam and her eye movements cannot be seen in the recording.  Officer Salamon told Amanda Caton that he would arrest her "for drinking and driving" but not "for the gun."  (Dashcam at 13:35–13:40.)  Officer Parks did not make an independent assessment of whether Amanda Caton was impaired.  (Doc. 15 at PageID 585.)  He testified that he "did not have enough facts to determine that she was impaired."  (*Id.* at PageID 586.)

Officer Salamon read Amanda Caton her rights and handcuffed her before placing her in the back of the cruiser.  (Dashcame at 15:00–16:00.)  Officers Salamon and Parks then spoke to Patrick Caton.  Officer Salamon asked Patrick Caton, "What is your plan?" in terms of how he wanted to get home.  (Dashcam at 18:30.)  Officer Salamon offered to drive him home, but Patrick Caton declined a ride.  (Dashcam at 18:30–18:40.)  Patrick Caton then spoke to Officer Parks for about thirty seconds before deciding to walk home.  (Dashcam at 19:10, 20:23.)  Neither Officer Salamon nor Officer Parks tried to determine whether Patrick Caton was legally impaired or too intoxicated to drive a vehicle.  (Doc. 15 at PageID 589; Doc. 17 at PageID 1027.)  Officer Salamon then told Amanda Caton he would park the car and she said "okay."  (Dashcam at PageID 19:43.)

Officer Salamon transported Amanda Caton to the Loveland Police Department to complete the necessary paperwork.  He charged her with violations of Ohio Revised Code § 4511.19 for OVI and of Ohio Revised Code § 4511.25 for a marked lane violation for when she crossed the center line on her left turn at the five-way intersection.  (Doc. 17-1 at PageID 1554.)  Officer Salamon then drove Amanda Caton home, stopping by her vehicle to pick up her purse and her firearm.  Officer Parks separately drove to the Caton home to provide back-up.  The officers walked Amanda Caton to the driveway and took several steps onto the driveway to

or immediately past the sidewalk.  (Dashcam at 1:29:00.)  Amanda Caton estimated that they stepped five yards onto her driveway and remained 20–30 yards from her house.  (Doc. 12 at PageID 200.)  Patrick Caton, on the other hand, estimated that the officers stepped 15–20 yards up his driveway, but this testimony is contradicted by the dashcam recording.  (Doc. 13 at PageID 381–382.)  Officer Salamon intended to secure the purse with the handgun in the trunk of one the Caton's vehicles.  (Doc. 17 at PageID 1040, 1043.)  The dashcam recording shows the officers interacting with the Catons on their driveway, but there is no audio on the recording, so the Court does not know what was said.  The officers remained on the driveway for less than two minutes.  (Dashcam at 1:28:00–1:29:54.)

The City of Loveland received media request following the arrest of Amanda Caton and produced certain redacted footage in response.  Officers Salamon and Parks denied that he notified any reporters or published any footage of the incident to the media.  (Doc. 17 at PageID 1045–1046; Doc. 15 at PageID 538–539.)

### 3.    Other Relevant Facts

Amanda Caton disputed the criminal charge against her.  Chief Rahe reviewed the arrest report and dashcam recording and determined that Officer Salamon's and Park's conduct appeared to comply with the police department's policy.  (Doc. 16 at PageID 755, 774–775, 777, 794–795.)  The Clermont County Prosecutor's Office requested that a City of Loveland detective go to the establishments that the Catons had visited that night and obtain their credit card receipts to help prove the charges.  (Doc. 15 at PageID 501; Doc. 16 at PageID 792.)  Officer Parks testified that such an investigation was not "standard practice" after an OVI arrest.  (Doc. 15 at PageID 504–505.)  Amanda Caton was acquitted of the OVI charge following a criminal trial.  (Doc. 16 at PageID 793; Doc. 17 at PageID 1053.)

The City of Loveland's statistics showed that Officer Salamon was responsible for 70% of the City's OVI arrests in 2017, and he made more traffic stops than the other officers as well. (Doc. 16 at PageID 722–723, 762.) He had the most OVI arrests of any Loveland officer each year during his tenure at the department. (Doc. 17 at PageID 951.) A Loveland police lieutenant, with the approval of Chief Rahe, nominated Officer Salamon for the 2020 MADD Award of Excellence on or before February 21, 2020. (Doc. 16 at PageID 760.)

**B.    Procedural Posture**

The Catons filed this suit against Officer Salamon, the City of Loveland, Chief Rahe, and Officer Parks on June 14, 2022. (Doc. 1.) They asserted four counts for relief in the Complaint: (1) violation of the Fourth and Fourteenth Amendments; (2) false arrest/false imprisonment; (3) malicious prosecution; and (4) invasion of privacy interest on seclusion. (*Id.* at PageID 9–15.) Following discovery, Defendants moved for summary judgment. (Doc. 22.) Plaintiffs filed a Response in Opposition to which Defendants filed a Reply. (Docs. 30, 37.)[2]

**II.    STANDARD OF LAW ON A SUMMARY JUDGMENT MOTION**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are disputed. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the

---

[2] Separately pending before the Court are Plaintiffs' Motion to Exclude, or in the Alternative Limit, Testimony of Joseph Suhre, Defendants' Motion to Strike Improper Expert Opinions and Affidavit of Tony Corroto, and Defendants' Motion to Strike Declaration of Patrick Caton. (Docs. 27, 35, 36.) The Court is addressing those Motions in separate Orders issued contemporaneously with this Order.

nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest on the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

## A.    Claims against the Individual Defendants

To begin, the Court will address Defendants' contention that the federal claims against Officer Salamon, Chief Rahe, and Officer Parks (collectively, "the Individual Defendants") were asserted against them only in their official capacity. "Suing a public official in his official capacity for acts performed within the scope of his authority is equivalent to suing the

governmental entity." *Soper v. Hoben,* 195 F.3d 845, 853 (6th Cir.1999) (citing *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)).  "When a § 1983 plaintiff fails to affirmatively plead capacity in the complaint, we then look to the course of proceedings" to determine whether the defendants were put on notice that the plaintiffs seek to hold them individually liable.  *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001).

The Catons identify the Individual Defendants by their names only in the case caption, not by their job titles, suggesting that they are being sued in their individual capacity.  (Doc. 1 at PageID 1.)  In the preamble, the Catons specifically state that Officer Salamon is being sued in his individual capacity, but they did not specify in what capacity Chief Rahe and Officer Parks are being sued.  (*Id.* at PageID 2.)  However, in the prayer for relief, the Catons describe Defendants as "the individual capacity Defendant*s* and City Defendant" suggesting that all three Individual Defendants were sued in their individual capacities.  (*Id.* at PageID 15.)  The Catons also seek punitive damages, which is another indication that the Catons seek to hold the Individual Defendants personally liable.  *See Rodgers v. Banks*, 344 F.3d 387, 594 (6th Cir. 2003).  Finally, Defendants had sufficient notice of at least the potential for individual capacity liability that they raised a defense of qualified immunity in their Answer and in the Motion for Summary Judgment.  (Doc. 4 at PageID 50; Doc. 22 at PageID 1812.)  The Court concludes that the claims against the Individual Defendants should be treated as individual capacity claims.

**B.    Count 1: Fourth and Fourteenth Amendment Violations**

In Count 1, the Catons allege a violation of their Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.  (Doc. 1 at PageID 9–13.)  The Fourth Amendment, applicable to the States through the Fourteenth Amendment, provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated." U.S. Const. amend IV. Section 1983 creates a cause of action to remedy constitutional violations:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Plaintiffs allege that Defendants violated their Fourth Amendment rights in five discrete ways: (1) lack of probable cause or reasonable suspicion to initiate a traffic stop; (2) lack of reasonable suspicion to expand the scope of the traffic stop to investigate whether Amanda Caton committed an OVI offense; (3) lack of probable cause to arrest Amanda Caton for OVI; (4) lack of probable cause or warrant to seize Patrick Caton, the Caton vehicle, or Amanda Caton's purse and firearm; and (5) lack of warrant to enter onto the curtilage of the Catons' residence.

Defendants assert multiple bases for summary judgment for each subclaim. Primarily, they assert that Individual Defendants have qualified immunity because Officers Salamon and Parks did not violate any clearly established Constitutional right of the Catons in the circumstances of this case. They also assert that Chief Rahe did not personally commit any acts for which he can be held liable under § 1983. Finally, they assert that Plaintiffs cannot establish *Monell* liability against the City of Loveland even if Officers Salamon or Parks did violate the Catons' rights.

### 1.    Qualified Immunity

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity provides immunity from suit, not simply a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, courts must ask whether the government official's conduct violated a constitutional right, and if yes, whether the specific right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200–201 (2001). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232. A defendant is entitled to qualified immunity if his conduct violated a constitutional right, but that right was not clearly established at the time of the violation. *Saucier*, 533 U.S. at 200–201. Courts can examine either issue first. *Pearson*, 555 U.S. at 236. Plaintiffs bear the burden to prove that Individual Defendants are not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

The inquiry into whether the constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Courts look "first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was clearly established when the action complained of occurred." *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012) (citation omitted). Case law must "dictate [or] truly compel" the conclusion; it is not enough for case law to "suggest or allow or raise a question about" the conclusion. *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (citation omitted). Also, the cases relied on must be both published and binding to clearly establish a point of law. *Brown v. Giles*, 95 F.4th 436, 439 (6th Cir. 2024); *Bell v. City of Southfield, Michigan*, 37 F.4th 362, 367–368 (6th Cir. 2022).

Finally, qualified immunity applies to protect an officer who reasonably, but mistakenly, believes his conduct was lawful. "Qualified immunity shields an officer from suit when she

12

makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation and citation omitted).

### 2.      Initiation of the Traffic Stop

Plaintiffs first argue that Officer Salamon did not have probable cause to initiate a traffic stop and pull over the Caton vehicle.  "Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment." *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008).  "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).  In this case, Officer Salamon stopped the Caton vehicle on the grounds that Amanda Caton committed a marked line violation as she turned left from Second Street onto Broadway Street.  The dashcam recording shows that the vehicle was fully to the left of the dashed yellow turn line during the turn and the left wheels crossed over the double yellow solid lines and the perpendicular white stop bar on Broadway Street at the end of the turn.  (Dashcam at 00:26–00:29.)  The Catons' assertions to the contrary do not create a genuine dispute of material fact in light of the objective video evidence.

Ohio Revised Code § 4511.25(A) provides generally that vehicles must drive "on the right half of the roadway."  It provides an exception for "making a left turn under the rules governing such movements."  Ohio Rev. Code § 4511.25(A)(1).  Plaintiffs argue that Amanda Caton did not violate § 4511.25(A) because she crossed the dashed yellow turn line and the solid double yellow lines on Broadway Street only as part of making a left turn as allowed by Ohio

Revised Code § 4511.25(A)(1). The Catons cite to no court decision holding that a driver can drive in, rather than across, the opposing lane of traffic when making a left-hand turn. The Court reads the exception in § 4511.25(A)(1) to merely reflect the reality that a driver must drive across the left half of the roadway—the opposing lane of traffic—to make a left turn. This is consistent with a separate provision of the Ohio Revised Code that makes it illegal for a vehicle "to drive upon the left side of the roadway . . . [w]hen approaching within one hundred feet of or traversing any intersection." Ohio Rev. Code § 4511.30(A)(3). These provisions cannot sensibly be read to allow a vehicle to drive on the left side of a dashed yellow turn line or across the white stop bar for the opposing lane of traffic when turning left at an intersection.

An Ohio Court of Appeals has rejected the same argument made by the Catons here. *See Ohio v. McGlinch*, 2019-Ohio-1380, ¶¶ 14–18, 135 N.E.3d 406, 409–410 (Ohio App. 2d 2019). In *McGlinch*, the driver argued that "R.C. 4511.25 explicitly states that a vehicle is not required to be driven on the right side of the roadway when making a left turn." *Id.*, 135 N.E.3d at 410. The court rejected this argument and held that the officer had a reasonable suspicion that the driver failed to make a proper left turn because she "cross[ed] the stop bar on the road upon completing the left turn." *Id.* 135 N.E.3d at 410. It also held that "the State was not required to present evidence negating the exceptions to the general statutory requirement to drive on the right half of the roadway." *Id.* The facts are analogous here. The Court holds that Officer Salamon is entitled to qualified immunity for the traffic stop because he did not violate any of the Catons' clearly established rights when he initiated the traffic stop with probable cause.

### 3. Reasonable Suspicion for a Prolonged Stop and OVI Investigation

The Catons also argue that Officer Salamon illegally prolonged the traffic stop to conduct an OVI investigation. "Detaining the motorist any longer than is reasonably necessary to issue

the traffic citation requires reasonable suspicion that the individual has engaged in more extensive criminal conduct" such as OVI. *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012); *see also United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) ("[A]n officer may detain an individual after a routine traffic stop is completed if the officer has a reasonable suspicion that the individual is engaged in criminal activity.") The parties here dispute whether Officer Salamon had reasonable suspicion that Amanda Caton was driving while intoxicated.[3]

The Sixth Circuit has explained the reasonable suspicion standard:

Although less demanding than the probable-cause standard, the reasonable-suspicion standard still requires more than a mere hunch. It requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop. In conducting a reasonable-suspicion analysis, reviewing courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing, while bearing in mind that officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. This totality-of-the-circumstances inquiry requires courts to determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.

*Green*, 681 F.3d at 860–861 (cleaned up). Therefore, the Court must examine whether there were specific objective facts giving rise to reasonable suspicion. Officer Salamon identifies factors found both when Amanda Caton was driving and during the initial traffic stop as the basis for his reasonable suspicion of OVI. The Court will start with the driving incidents.

The Court has found that Officer Salamon had probable cause to determine that Amanda Caton committed a marked lane violation when turning from Second Street onto Broadway

---

[3] The Court notes that it is not unconstitutional for a police officer to request to see a motorist's license and registration, to ask her questions about where she was driving, or to ask her to step out of the vehicle as part of the initial traffic stop. *See Ariz. v. Johnson*, 555 U.S. 323, 331 (2009) (stating an officer had the right to "order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (stating an officer may "check[] the driver's license . . . and inspect[] the automobile's registration and proof of insurance."); *United States v. Ellis*, 497 F.3d 606, 613–614 (6th 2007) ("Trooper Topp was justified in asking the occupants general questions of who, what, where, and why regarding their 3:23 a.m. travel.").

Street.  Officer Salamon's assertion that Amanda Caton committed other marked lane violations when the vehicle crossed onto the solid yellow line center lines four other times requires more analysis.  The dashcam recording shows that the vehicle's left tires crossed onto the solid yellow lines four times in less than one minute.  (Dashcam at 01:14–01:16, 01:22, 02:09, and 02:30.) The vehicle did not cross over the lines and into the oncoming traffic lane.  (*Id.*)  The National Highway Traffic Safety Administration recognizes both weaving within a lane and across lane lines to be potential signs of an intoxicated driver.  (Doc. 29-2 at PageID 2108; Doc. 29-7 at PageID 2139–2140.)  However, the Sixth Circuit held in an unpublished opinion that "touching the lane line is not a violation of Ohio's traffic code" and is "not evidence of intoxication." *United States v. Warfield*, 727 F. App'x 182, 187 (6th Cir. 2018).[4]  It also stated that "weaving *within a lane*" can indicate intoxication if "other indicia of erratic driving" also exist.  *Id.*

Here, Amanda Caton made the marked lane violation when turning left at the intersection of Second Street and Broadway Street.  On the other hand, Officer Salamon does not allege, and no evidence indicates, that Amanda Caton was speeding or ignored traffic signs or signals when she was driving.  Instead, she stopped at a traffic light and appeared to reduce speed appropriately when she drove around curves in the road.  (Dashcam at 00:15, 00:40–01:30.)  She stopped her vehicle when Officer Salamon turned on his flashing lights.  (Dashcam at 02:38–02:50.)

Defendants contend that factors during the traffic stop also gave rise to Officer Salamon's finding of reasonable suspicion including the time of night, an odor of alcoholic beverages, Amanda Caton's watery and bloodshot eyes, her slurred speech, and her failure to immediately comply with requests to open or unlock the vehicle trunk.  These factors have been recognized as

---

[4]  The Sixth Circuit has emphasized that unpublished decisions cannot be used to determine what law is clearly established for purposes of a qualified immunity analysis.  *Brown*, 95 F.4th at 439; *Bell*, 37 F.4th at 367–368.

legally relevant.  *See Bradley v. Reno*, No. 4:12CV00890, 2014 WL 4955948, at *5 (N.D. Ohio

Sept. 30, 2014) (citation omitted), *aff'd*, 632 F. App'x 807 (6th Cir. 2015).  The Catons,

however, dispute that the totality of the factors present gave rise to reasonable suspicion.

    The Catons denied that Amanda Caton was intoxicated.  (Doc. 12 at PageID 202;

Dashcam at 06:15–06:55.)  During the traffic stop, Amanda Caton understood the questions that

Officer Salamon asked her and she answered each question coherently.  She immediately

cooperated and turned over her firearm when Officer Salamon requested it.  (Dashcam at 04:25.)

She was steady on her feet, walked in a straight line, and communicated clearly when Officer

Salamon requested that she talk to him at the police cruiser.  (Dashcam at 07:17–15:00.)

    The Catons also dispute the facts surrounding the alleged physical signs of intoxication

that Officer Salamon noted.  Officers Salamon and Parks both stated they smelled an odor of

alcohol.  (Dashcam at 06:04; Doc. 15 at PageID 598.)  Patrick Caton denied in a sworn

Declaration that Amanda Caton smelled of alcohol.  (Doc. 30-2 at PageID 2230.)  As to Amanda

Caton's eyes, Patrick Caton stated that Amanda Caton's eyes were not glassy or bloodshot.  (*Id.*)

Amanda Caton admitted that she had a medical condition which caused her eyes to be fatigued

and watery, but she did not know if her eyes were bloodshot.  (Doc. 12 at PageID 122, 125.)  The

condition of her eyes cannot be seen in the low resolution dashcam recording.  As to Amanda

Caton's speech, Patrick Caton stated that "her speech was not slurred" and that she "talked how

she always talks."  (Doc. 30-2 at PageID 2230.)  Amanda Caton testified that her speech is a bit

"different" possibly because she has a hearing problem and a slight British accent.  (Doc. 12 at

PageID 117–119.)  The Court was able to understand what she said to Officer Salamon during

the traffic stop.

    Genuine disputes of material fact remain.  The Court cannot determine as a matter of law

that Officer Salamon had a reasonable suspicion necessary to extend the traffic stop and conduct

the OVI investigation. The Court will deny qualified immunity on this issue.

### 4. Probable Cause for OVI Arrest

It is clearly established law that an arrest without probable cause constitutes a Fourth

Amendment violation. *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003). An

"officer must consider the totality of the circumstances, recognizing both the inculpatory *and*

exculpatory evidence, before determining if he has probable cause to make an arrest." *Miller v.*

*Sanilac Cnty.*, 606 F.3d 240, 249 (6th Cir. 2010) (citation omitted). As to probable cause and the

§ 1983 analysis, the Sixth Circuit has explained:

> In general, the existence of probable cause in a § 1983 action presents a jury
> question, unless there is only one reasonable determination possible. But under
> § 1983, an arresting agent is entitled to qualified immunity if he or she could
> reasonably (even if erroneously) have believed that the arrest was lawful, in light
> of clearly established law and the information possessed at the time by the
> arresting agent.

*Id.* at 248 (citation omitted); *see also Hunter*, 502 U.S. at 227, 229 (stating that officers who

reasonably but mistakenly determine that probable cause exists are entitled to qualified

immunity).

The evidence relied upon by Officer Salamon as supporting probable cause is the same

evidence discussed above as to reasonable suspicion for the OVI investigation, plus the results of

the HGN field sobriety test. Officer Salamon stated in his arrest report that "6 of 6 clues were

observed" during the HGN test. (Doc. 17-1 at PageID 1557.) "The results of a properly

administered field sobriety test may serve as evidence of probable cause to make a drunk-driving

arrest." *Bradley*, 632 F. App'x at 810 (citing *Ohio v. Boczar,* 113 Ohio St.3d 148, 863 N.E.2d

155, 158 (2007)). The Supreme Court has explained the HGN test:

> The "horizontal gaze nystagmus" test measures the extent to which a person's
> eyes jerk as they follow an object moving from one side of the person's field of

vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated "the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." 1 R. Erwin et al., Defense of Drunk Driving Cases § 8A.99, pp. 8A–43, 8A–45 (1989).

*Penn. v. Muniz*, 496 U.S. 582, 585 n.1 (1990).

The parties' proffered experts dispute whether Officer Salamon properly administered the HGN test. Plaintiffs' expert, Tony Corroto, opined that Amanda Caton was not a medical candidate for the HGN because a person with a lazy eye "will not have the ability to track a stimulus equally during the medical qualification phase of HGN." (Doc. 30-1 at PageID 2218.) He also explained that Officer Salamon positioned the stimulus below eye level and moved it "down and away from Ms. Caton at the end point during the mechanics of administration" in contravention of HGN protocols. (*Id.* at PageID 2219.) HGN protocols call for the stimulus to be above eye level. (*Id.*; NHTSA, SFST DWI Detection and Standardized Field Sobriety Testing Participant Manual ("NHTSA Participation Manual"), Session 8 p. 24 (2023).) He concluded that "any clues of nystagmus obtained from this officer's administration should not be used as probable cause" because the mechanics were "improper, incomplete, and not valid or reliable." (Doc. 30-1 at PageID 2220.)

On the other hand, Defendants' proffered expert, Joseph Suhre, opined that Officer Salamon did administer the HGN correctly. He stated that a lazy eye is not medically disqualifying if prescreening testing shows equal tracking. (Doc. 29-2 at PageID 2111–2112 (citing NHTSA Participation Manual, Session 8 p. 22 (discussing how to proceed if the testing subject is blind in one eye or has an artificial eye)).) He also stated that the fact that Officer Salamon held the stimulus below eye level "does not invalidate the results obtained in the administration of the HGN." (Doc. 29-2 at PageID 2111.)

The Court cannot make the necessary credibility determinations nor resolve the factual

dispute about the validity of the HGN results at summary judgment. Given the importance of the HGN results to the probable cause determination, the Court cannot determine at summary judgment whether Officer Salamon reasonably believed he had probable cause to arrest Amanda Caton for OVI. This genuine dispute of material fact should be submitted to a jury. *See Miller*, 606 F.3d at 248. Officer Salamon is not entitled to qualified immunity if he did not reasonably believe he had probable cause to arrest Amanda Caton. The Court will deny qualified immunity to Officer Salamon on this issue.

**5.    Seizure of Patrick Caton, the Vehicle, and Amanda Caton's Purse and Gun**

Plaintiffs argue that Officers Salamon and Parks violated their Fourth Amendment rights when they seized Patrick Caton, the Caton vehicle, and Amanda Caton's purse and firearm. After Amanda Caton was arrested and placed in the back of the police cruiser, the officers explicitly gave Patrick Caton the option to ride home in the cruiser or walk, but they did not explicitly give him the option to drive the Caton vehicle home. (Doc 15 at PageID 590; Doc. 17 at PageID 1025–1026.) Officer Salamon admitted that he "effectively took control of the vehicle while on the roadside." (Doc. 17 at PageID 1026.) Neither Officer Salamon nor Officer Parks tried to determine whether Patrick Caton was legally impaired or too intoxicated to drive a vehicle. (Doc. 15 at PageID 589; Doc. 17 at PageID 1027.) On the other hand, Patrick Caton never asked to drive the vehicle home after Amanda Caton was placed in the police cruiser. Officer Salamon informed Amanda Caton he would park the car and she said "okay." (*Id.* at PageID 19:43.) Officer Salamon parked the vehicle at a preschool parking lot. (Doc. 12 at PageID 197.)

After Officer Salamon processed Amanda Caton's arrest at the station, he drove her back to the vehicle to pick up her purse with the loaded firearm, before driving her back to her house.

Officer Salamon kept possession of the purse with the loaded firearm until arriving at the Caton residence. (Doc. 17 at PageID 1037–1038.) The Catons do not point to evidence that Amanda Caton objected to the manner by which Officer Salamon secured her purse or firearm or explicitly requested the return of her purse and handgun at any time. Officer Parks drove separately to the Caton household. Both officers stepped out of their cruisers and onto the Catons' driveway. Officer Salamon's intention was to have the Catons open a vehicle trunk, and he would secure the purse with the firearm in the trunk. (*Id.* at PageID 1043.)

A warrantless search or seizure is "*per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (internal quotation and citation omitted). "Consent is one such exception." *Id.* Plaintiffs' argument on this subclaim is short and conclusory. They do not explain at what point Officer Salamon or Officer Parks seized Patrick Caton or the Caton vehicle nor do they provide case law with analogous facts showing that such seizure was clearly established as illegal. Likewise, they do not provide any case law showing that Officer Salamon violated clearly established law in how he secured her purse during the entire incident. The Catons have not met their burden of proof to establish that Officers Salamon and Officer Parks are not entitled to qualified immunity on these subclaims.

### 6. Entry onto Curtilage

Finally, the Catons also assert that Officer Salamon and Parks violated the Fourth Amendment when they entered upon the curtilage of their home without a warrant. It is "black letter law" that the Fourth Amendment protects both a person's home and the curtilage to the home. *Collins v. Va.*, 584 U.S. 586, 592 (2018). The curtilage is the "area immediately surrounding and associated with the home." *Id.* (citation omitted). It includes areas "adjacent to

the home and to which the activity of home life extends." *Id.* at 594 (internal quotation and citation omitted). Courts examine four factors to determine whether an area should be considered protected curtilage: "(1) proximity to the home; (2) whether the area is within an enclosure around the home; (3) uses of the area; and (4) steps taken to protect the area from observation by passersby." *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019).

In this case, the officers proceeded about 5–10 yards up the Catons' driveway to the sidewalk portion of the driveway or perhaps immediately beyond. (Dashcam at 1:29:00.) Patrick Caton's testimony that the officers stepped 15–20 yards up the driveway is refuted by the dashcam recording. However, the dashcam recording is taken from a side angle and the recording is dark. The Court cannot determine the proximity of the officers to the garage of the home when they walked up the driveway. It is also not possible to see if there was a fence or landscaping present to the left of the driveway that might have protected the area from observation from at least one side. A jury will be better able to determine whether the officers entered without consent and without a warrant upon the curtilage of the Catons' home. The Court will deny qualified immunity to Officers Salamon and Parks on this subclaim.

### 7.    Liability of Officer Parks

In a claim for constitutional violations pursuant to 42 U.S.C. § 1983, each defendant's liability must be assessed individually, based on his or her own actions. *Dorsey v. Barber,* 517 F.3d 389, 399 n. 4 (6th Cir. 2008). A supervisor cannot be held liable under § 1983 based only on respondeat superior. *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995). A supervisor is liable only if he encouraged, participated in, authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates. *See, e.g.*, *Id.; Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487–488 (6th Cir. 2020).

The Court has already determined that the traffic stop did not violate the Catons' rights because Officer Salamon had probable cause to believe that Amanda Caton committed a traffic violation. Officer Parks is entitled to qualified immunity on that basis alone, but the Court notes as well that he would receive qualified immunity on the additional basis that he did not participate in or authorize the traffic stop. Likewise, Officer Parks did not arrive at the scene until after Officer Salamon had extended the traffic stop and began the OVI investigation. He is entitled to qualified immunity on that subclaim as well.

A reasonable jury could find that Officer Parks participated in or knowingly acquiesced in the decision to arrest Amanda Caton for OVI. Officer Parks did not make an independent determination of whether Amanda Caton was legally impaired. (Parks Dep., Doc. 15 at PageID 585.) The Court has held that genuine issues of material fact in dispute preclude the Court from determining whether Officer Salamon reasonably believed he had probable cause to arrest Amanda Caton for OVI. Officer Parks, like Officer Salamon, is not entitled to qualified immunity on the arrest subclaim.

Finally, as stated above, Officer Parks was present and participated or acquiesced in the decisions to allow Patrick Caton to walk home, to park the Caton vehicle at the preschool parking lot, to keep possession of Amanda Caton's purse and firearm until arriving at her driveway, and to enter upon the Caton's driveway. The Catons have not met their burden to prove that Officers Salamon and Parks are not entitled to qualified immunity on the Patrick Caton, the Caton vehicle, and Amanda Caton purse subclaims based on these decisions. The Court will grant them summary judgment on these subclaims. However, Officer Parks is not entitled to qualified immunity or summary judgment on the subclaim based on the officers entry onto the curtilage of the Caton home.

### 8.     Liability of Chief Rahe

The Catons also seek to hold Chief Rahe individually liable for the purported Fourth Amendment violations committed by Officers Salamon and Parks.  He can only be held liable as a supervisor if he encouraged, authorized, or approved of the unconstitutional conduct.  The Court has held that genuine issues of material fact preclude a determination of whether Officer Salamon violated Amanda Caton's rights when he extended the traffic stop to conduct an OVI investigation and whether both Officers Salamon and Parks violated her rights when they arrested her for OVI.  Chief Rahe is entitled to qualified immunity if the jury concludes that Officers Salamon and Parks did not violate Amanda Caton's rights.  Chief Rahe also is entitled to qualified immunity even if they violated Amanda Caton's rights if he did not encourage, authorize, or approve of the unconstitutional conduct.

The evidentiary record identified by the Catons concerning Chief Rahe is sparse.  Chief Rahe was not present at and did not participate in the traffic stop and arrest that precipitated this lawsuit.  The Catons assert that Chief Rahe knew Officer Salamon had been investigated by his former employer for dishonesty and failure to report damage to his vehicle before this incident.  (Doc. 16. at PageID 699; Doc. 17 at PageID 907.)  After the incident, Chief Rahe reviewed the arrest report and dashcam video.  (Rahe Dep., Doc. 16 at PageID 755, 774–775, 777, 794.)

Chief Rahe is entitled to qualified immunity based on these limited allegations.  The Catons have not identified active conduct by Chief Rahe that caused or contributed to the alleged constitutional violations during the OVI investigation and arrest.  *See Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002) (stating that supervisory liability must be based on active unconstitutional behavior).  Chief Rahe's review of the incident after the fact did not violate the Catons' rights.  "After-the-fact approval of a subordinate's course of action, which does not itself

cause or continue the harm alleged, is insufficient to establish a claim for supervisory liability." *Watson v. Rees*, No. 1:22-CV-957, 2022 WL 16959233, at *5 (W.D. Mich. Nov. 16, 2022); *cf. Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) ("Fischer's after-the-fact approval of the investigation, which did not itself cause or continue a harm against Burgess, was insufficient to establish the *Monell* claim."); *King v. Zamiara*, No. 4:02-CV-141, 2009 WL 1067317, at *12 (W.D. Mich. Apr. 21, 2009) ("Liability cannot attach, however, where the supervisory official only becomes aware of the allegedly illegal conduct after the fact.") (internal quotation and citation omitted).

### 9. Liability of the City of Loveland

A municipality is "liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in the original). "[A] municipality is liable only for its own wrongdoing, not the wrongdoings of its employees" via respondeat superior. *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 565 (6th Cir. 2018). "[M]unicipalities can be held liable for harms caused by direct actions of the municipalities themselves, harms caused by the implementation of municipal policies or customs, and harms caused by employees for whom the municipality has failed to provide adequate training." *Id.* (internal citations omitted).

The City of Loveland is entitled to summary judgment on the Catons' subclaims based on the traffic stop and on the seizure of Patrick Caton, the Caton vehicle, and the purse and firearm because the Court held that no constitutional violations occurred in those respects. At trial, the City of Loveland cannot be held liable under a *Monell* analysis if a reasonable jury concludes that Officers Salamon and Parks did not violate Amanda Caton's rights during the OVI investigation or arrest. Likewise, it cannot be held liable under a *Monell* analysis if a reasonable

jury concludes that Officers Salamon and Parks did not violate the Catons' rights by entering upon the curtilage of their home.

The analysis of *Monell* liability is more complex if a reasonable jury were to conclude at trial that the officers violated Amanda Caton's rights during the OVI investigation and arrest or both Catons' rights by entering upon the curtilage of their home.  In that circumstance, the Catons argue that there is sufficient evidence to prove *Monell* liability against the City of Loveland for at least the OVI investigation and arrest subclaims by either the existence of an unconstitutional policy or custom or by failure to train.  In a policy or custom case, the plaintiff must "identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of the policy." *Andrews v. Wayne Cnty. Mich.*, 957 F.3d 714, 721–722 (6th Cir. 2020) (citation omitted).

The Catons do not present specific argument or evidence to prove that the City of Loveland had an unconstitutional policy or custom to allow its officers to enter upon the curtilage of citizens' homes without a warrant.  They also do not present evidence or argument that the City of Loveland unconstitutionally failed to train its officers about citizens' right to privacy in their home and curtilage.  The Court will grant summary judgment to the City of Loveland on this subclaim.

On the other hand, the Catons argue that the City of Loveland had an unofficial policy or custom to encourage Officer Salamon's aggressive unconstitutional enforcement of OVI laws. They point out that the City of Loveland's own statistics showed that Officer Salamon was responsible for 70% of the City's OVI arrests in 2017 and he made more traffic stops than the other officers as well.  (Doc. 16 at PageID 722–723, 762.)  He had the most OVI arrests of any Loveland officer each year during his tenure at the department.  (Doc. 17 at PageID 951.)  A

police lieutenant nominated Officer Salamon for the 2020 MADD Award of Excellence.  (Doc. 16 at PageID 760.)  The Catons argue that Officer Salamon's disproportionately high OVI statistics, plus the fact that he was investigated for dishonesty on the job by the Ohio State Highway Patrol, should have put the City of Loveland on notice that Officer Salamon was overzealous and acted in an unconstitutional manner when making OVI arrests.

In failure-to-train cases, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact."  *City of Canton*, 489 U.S. at 388 (emphasis added).  Deliberate indifference can be established in one of two ways:  (1) "[a] pattern of similar constitutional violations by untrained employees" and defendant's "continued adherence to an approach that [it] knows or should know has failed to prevent tortious conduct by employees"; or (2) "a single violation of federal rights, accompanied by a showing that [defendant] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation."  *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 739 (6th Cir. 2015) (internal quotations and citations omitted).  "This second mode of proof is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'"  *Id.* (citation omitted).  "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform."  *City of Canton*, 489 U.S. at 390.

The evidence here supports at most a finding that there was a single incident in which the Loveland officers violated a citizen's federal rights.  Therefore, the Catons have to make a deliberate indifference showing that the City of Loveland failed to train its officers "to handle recurring situations presenting an obvious potential for a constitutional violation."  *Shadrick*, 805

F.3d at 739.  The determination of when a traffic stop should be extended to investigate for an OVI violation and when probable cause to arrest for an OVI violation are recurring situations that present an obvious potential for constitutional violation.  Therefore, the Court must examine whether the training Loveland officers received was sufficient.

The evidence on what training Loveland police officers received is not conclusive. Officer Salamon received training from a field training officer for twelve to sixteen weeks when he was first hired at Loveland.  (Doc. 17 at PageID 937–938.)  He did not train with a professional standards lieutenant.  (*Id.* at PageID 939.)  Chief Rahe testified that field officer training generally covered "policies and procedures on different crimes, criminal law, traffic enforcement, community engagement, general operations of the department and the city."  (Doc. 16 at PageID 713.)  He stated that the training covered traffic stops and searches and seizures. (*Id.* at PageID 713, 753.)  Officer Salamon also participated in other in-service training sessions held by the City of Loveland periodically.  (Doc. 17 at PageID 965–966.)  The City of Loveland brought in attorneys to provide training and updates on evolving search and seizure legal standards.  (*Id.* at PageID 974–980.)  Chief Rahe testified that the City of Loveland also provided officers with "regular updates on [constitutional] rights and legal cases through the daily training bulletins."  (Doc. 16 at PageID 738.)  The training software provided a short quiz on the training material.  (*Id.* at PageID 739.)  Loveland typically provided the officers with fifteen training bulletins per month.  (*Id.* at PageID 746.)  Chief Rahe testified that he recalled that "there were numerous training bulletins covering search or seizure."  (*Id.* at PageID 744.)

On the other hand, both Officers Salamon and Parks testified that they had not received training from the City of Loveland on OVI detection or arrest.  (Doc. 17 at PageID 945; Doc. 15 at PageID 558–559.)  Officer Parks testified that he did not "remember any official OVI

training . . . done by Loveland." (Doc. 15 at PageID 55–559.) Officer Salamon testified that he had training on OVI detection and arrest, but he did not recall receiving "additional training" by Loveland on this topic. (Doc. 17 at PageID 944–945, 978.) Officer Salamon had completed the trainings required by the Ohio Peace Officers Training Academy and additional training on alcohol detection and drug enforcement when he was employed by the Ohio State Highway Patrol before joining the Loveland Police Department. (*Id.* at PageID 887.)

The Court will deny summary judgment to the City of Loveland on the OVI investigation and arrest claims because genuine issues of material fact remain in dispute.

## C.    Count 2: False Arrest/False Imprisonment

In Count 2, the Catons assert that Officer Salamon, Officer Parks, and the City of Loveland are liable for false arrest/false imprisonment under Ohio law. (Doc. 1 at PageID 13–14.) Claims for false arrest and false imprisonment are the same under Ohio law. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 315 (6th Cir. 2005). The elements of a claim for false arrest are "(1) the intentional detention of the person and (2) the unlawfulness of the detention." *Id.* A showing that an arrest was made with probable cause defeats a false arrest claim. *Id.* Defendants argue that they are entitled to summary judgment because Officers Salamon and Parks had probable cause to arrest Amanda Caton for OVI. But the Court has concluded that a genuine dispute of material fact exists as to whether Officers Salamon and Parks had probable cause.

Even so, Defendants are entitled to summary judgment if they qualify for statutory immunity under Ohio Revised Code Chapter 2744. As to the claim against the City of Loveland, Ohio Revised Code Chapter 2744 "requires a three-tiered analysis to determine whether a political subdivision should be allocated immunity from civil liability." *Hubbard v. Canton City*

*Sch. Bd. of Educ.*, 97 Ohio St. 3d 451, 780 N.E.2d 543, 546 ¶ 10 (2002). The first tier recognizes the general rule stated in Ohio Revised Code § 2744.02(A)(1) that political subdivisions are not liable in damages for injury, death, or loss caused by the political subdivision or its employee in connection with a governmental or proprietary function. *See id.*; *Wilson v. Stark Cnty. Dept. of Hum. Servs.*, 70 Ohio St. 3d 450, 639 N.E.2d 105, 107 (1994). The second tier requires analysis of whether the exceptions to immunity in Ohio Revised Code § 2744.02(B) apply. *See Hubbard*, 780 N.E.2d at 546 ¶ 12. Finally, immunity can be reinstated under the third tier if the political subdivision can successfully argue that a defense contained in Ohio Revised Code § 2744.03 applies. *See Cater v. City of Cleveland*, 83 Ohio St. 3d 24, 697 N.E.2d 610, 615 (1998).

The City of Loveland is a political subdivision. *See* Ohio Rev. Code § 2744.01(F) (defining political subdivisions to include municipal corporations). Policing is a governmental function. *See* Ohio Rev. Code § 2744.01(C)(2)(a). Therefore, the City of Loveland has immunity under § 2744.02(A)(1) unless one of the exceptions in § 2744.02(B) apply. The Catons have not established that any exceptions apply. Accordingly, the Court holds that the City of Loveland has statutory immunity under § 2744.02(A)(1) from liability on the state law claim.

As to the claim against Officers Salamon and Parks, Ohio Revised Code § 2744.03(A)(6) provides immunity to employees of political subdivisions for injury, death, or less caused to person or property allegedly caused by an act or omission in connection with a governmental function unless an exception to immunity applies. Officers Salamon and Parks as police officers for Loveland are employees of a political subdivision performing a governmental function. Ohio Rev. Code § 2744.01(C)(2)(a) & (F). They are entitled to immunity unless an exception applies. The Catons argue that the exception to immunity for an employee's acts "with malicious

purpose, in bad faith, or in a wanton or reckless manner" applies. *See* Ohio Rev. Code § 2744.03(A)(6)(b).[5] Malice is defined as "the state of mind under which a person intentionally does a wrongful act without a reasonable lawful excuse and with the intent to inflict injury or under circumstances from which the law will infer an evil intent." *Criss v. Springfield Twp.*, 56 Ohio St. 3d 82, 84–85, 564 N.E.2d 440, 443 (1990).

Under the Catons' theory of the case, Officer Salamon fabricated or exaggerated that Amanda Caton displayed physical signs of intoxication and relied on the HGN test when Amanda Caton was not a candidate for the test due to her lazy eye. They also assert that he ignored evidence that Amanda Caton was not impaired including that she stopped at a traffic light, pulled over the vehicle without incident when Officer Salamon turned on his lights, answered all questions coherently, and walked without visible difficulty. They assert that he acted with the intent to maintain his status with the Loveland Police Department as the officer with the most OVI arrests. Given the disputed issues of material fact, the Court cannot determine whether Officer Salamon acted with malicious purpose or in bad faith without making credibility determinations. Such determinations are appropriate for a jury. The Court will not grant summary judgment to Officer Salamon on the basis of statutory immunity.

On the other hand, the evidence is the record does not establish that Officer Parks acted with malice or in bad faith. The Catons argue that Officer Parks demonstrated malice only by

---

[5] Both parties suggest that whether whether the immunity of § 2744.03(A)(6) or one its exceptions applies is a question of law for the Court. (Doc. 22 at PageID 1832; Doc. 30 at PageID 2200.) There is some authority for their assertion. *See Ruble v. Escola*, 898 F. Supp. 2d 956, 982 (N.D. Ohio 2012). However, the Sixth Circuit has treated the issue as one proper for submission to a jury. *See Chesher v. Neyer*, 477 F.3d 784, 802 (6th Cir. 2007) ("We thus leave the determination of whether Parrott's actions amounted to wantonness or recklessness under § 2744.03(A)(6)(b) to a jury."); *see also Wilson v. Gregory*, 3 F.4th 844, 860–861 (6th Cir. 2021) (following *Chesher*); *Mercer v. Athens Cnty., Ohio* 72 F.4th 152, 165–166 (6th Cir. 2023) (implying that whether an employee acted with the requisite intent for purposes of § 2744.03(A)(6) would be submitted to a jury).

allowing Amanda Caton to be arrested without performing his own assessment of whether Amanda Caton was impaired.  Officer Parks, however, was not present to witness Amanda Caton's driving.  He had no reason to doubt Officer Salamon's account of what had occurred before he arrived on the scene.  After he arrived at the scene, Officer Parks observed that Amanda Caton had the smell of "alcoholic beverage on her breath" and was slurring her words. (Doc. 15 at PageID 598.)  He had backed up Officer Salamon on previous stops and never thought Officer Salamon arrested a person he should not have arrested.  (*Id.* at PageID 541, 598.) In these circumstances, no reasonable jury could conclude that Officer Parks acted maliciously or in bad faith when did not intervene to prevent Officer Salamon from arresting Amanda Caton for OVI.  He is entitled to statutory immunity under § 2744.03(A)(6).

The Court will grant summary judgment to Officer Parks and the City of Loveland on Count 2, but the Court will deny summary judgment to Officer Salamon on Count 2.

**D.      Count 3: Malicious Prosecution**

In Count 3 of the Complaint, the Catons assert that Officer Salamon and the City of Loveland only are liable for malicious prosecution under Ohio law.  (Doc. 1 at PageID 14.)  But the Catons and Defendants appear to agree in the summary judgment briefing that the Catons asserted this claim against all four Defendants, so the Court will assume the same.  (Doc. 30 at PageID 2195–2196; Doc. 37 at PageID 2297.)  "The elements of the tort of malicious criminal prosecution under Ohio law are '(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused.'"  *Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016) (quoting *Trussell v. Gen. Motors Corp.*, 53 Ohio St.3d 142, 559 N.E.2d 732, 736 (1990)).  It is undisputed that the third element is satisfied because Amanda Caton was acquitted on the OVI charge at a trial.  The Court also has concluded

that a reasonable jury could find that Officers Salamon and Parks lacked probable cause to arrest Amanda Caton.  The issue, therefore, is whether the Catons have presented evidence of malice.

The malice element overlaps with the statutory immunity defense raised by Defendants. The Court concluded above that Officer Parks did not act with malice.  He is entitled to statutory immunity under Ohio Revised Code § 2744.03(b)(6).  Whether Officer Salamon acted with malice and is entitled to statutory immunity under § 2744.03(b)(6) requires credibility determinations that the Court cannot make at this summary judgment stage.  Finally, as to Chief Rahe, the Catons assert that Chief Rahe and the City of Loveland authorized or ratified the wrongful conduct of Officer Salamon by having a detective go to the establishments that the Catons had visited that night and obtaining their credit card receipts.  (Doc. 30 at PageID 2196.) Officer Parks testified that such an investigation was not "standard practice" after an OVI arrest. (Doc. 15 at PageID 504–505.)  Beyond the fact that the Court would be loath to find that the police demonstrated malice by continuing to investigate a purported crime after the initial arrest, Chief Rahe testified that the detective performed the investigation at the direct request of the Clermont County Prosecutor's Office.  (Doc. 16 at PageID 792.)  No reasonable jury could conclude based on these facts that Chief Rahe acted with malice or bad faith.  He is entitled to statutory immunity under Ohio Revised Code § 2744.03(A)(6).  Finally, the City of Loveland has statutory immunity under Ohio Revised Code § 2744.02(A) for the reasons previously stated.

The Court will grant summary judgment to Officer Parks, Chief Rahe, and the City of Loveland on this claim, but deny summary judgment to Officer Salamon.

## E.    Count 4:  Invasion of Privacy Interest Intrusion on Seclusion

The Catons allege in their final claim that Officer Salamon, Officer Parks, and Chief Rahe intruded upon their privacy interests by taking efforts to ensure widespread media coverage

33

of the arrest of Amanda Caton and the confrontation with both Catons on their driveway.  (Doc. 1 at PageID 14–15.)  Ohio recognizes a tort of invasion of privacy in four circumstances: "(1) intrusion into plaintiff's seclusion, solitude, or private affairs; (2) public disclosure of embarrassing private facts about the plaintiff, (3) publicity that places plaintiff in a false light; and (4) appropriation of plaintiff's name or likeness for defendant's advantage."  *Yoder v. Ingersoll-Rand Co.*, No. 97-3710, 1998 WL 939885, at *2 (6th Cir. Dec. 22, 1998).  When an invasion of privacy claim is based on an allegation that an officer arrested a person without probable cause and thereby intruded upon his private affairs and produced publicity that placed her in a false light, the officer is not liable if probable cause in fact existed.  *Piro v. Franklin Twp.*, 102 Ohio App. 3d 130, 656 N.E.2d 1035, 1044 (1995).

The Catons assert that Defendants facilitated the notification about the arrest to the media.  Chief Rahe did help draft a press release concerning the arrest of Amanda Caton, a Cincinnati police officer, in response to media requests.  (Doc. 16 at PageID 783.)  It was placed on the City's website, as all press releases are.  (*Id.* at PageID 783–784.)  The City of Cincinnati requested copies of the arrest reports and recordings.  (*Id.* at PageID 780.)  Chief Rahe testified that the media interest in the story lasted for weeks.  (*Id.* at PageID 784.)

However, Chief Rahe denied knowing about how the media was informed about the arrest.  (*Id.* at PageID 778.)  Likewise, Officer Salamon explicitly denied that he notified any reporter or any person about Amanda Caton's arrest.  (Doc. 17 at PageID 1046.)  Officer Parks denied that he reported the incident to the media or knew who did.  (Doc. 15 at PageID 538–539.)  The Catons are left with only their speculation that someone associated with the City of Loveland or its Police Department must have alerted the media and the City of Cincinnati.  That suspicion may well be correct.  But without evidence that it was one of these three named

Defendants, each of them is entitled to summary judgment on the invasion of privacy subclaim based on the public release of information.

In the second subclaim, the Caton assert that Officers Salamon and Parks intruded upon their seclusion by entering upon their driveway when the officers dropped Amanda Caton at her house following her arrest.  "[T]he *scope of liability* for the actual tort of intrusion upon seclusion . . . confines liability to cases where a defendant's conduct is highly offensive to the ordinary reasonable man."  *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345 (6th Cir. 2023) (emphasis in the original; internal quotation and citation omitted).  The Court has found that questions of fact preclude a determination of whether the officers entered upon the curtilage of the Catons' house without a warrant.  The Catons contend that it was unnecessary for Officers Salamon and Parks to get out of their vehicles and escort Amanda Caton up her driveway and that they did so for the purpose of engaging in a confrontation with Patrick Caton.  The Court will deny qualified immunity and summary judgment to Officers Salamon and Parks on this claim.

## IV.    CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment (Doc. 22.) is **GRANTED IN PART AND DENIED IN PART**.

Summary judgment is granted in part and denied in part to Officer Salamon**.**  Summary judgment is denied to Officer Salamon on the Fourth Amendment reasonable suspicion for a prolonged stop and OVI investigation subclaim, the probable cause for an OVI arrest subclaim, and the entry onto the curtilage subclaim; on the false arrest/false imprisonment claim; on the malicious prosecution claim; and on the intrusion on seclusion claim based on his entry onto the Catons' driveway.

Summary judgment is granted in part and denied to Officer Parks. Summary judgment is denied to Officer Parks on the Fourth Amendment OVI arrest and entry onto the curtilage subclaims and on the intrusion on seclusion claim based on his entry onto the Catons' driveway.

Summary judgment is granted to Chief Rahe on all claims.

Summary judgment is granted in part and denied in part to the City of Loveland. Summary judgment is denied to the City of Loveland on the Fourth Amendment subclaims for the OVI investigation and arrest.

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge